Slip Op. 19-1

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NEXTEEL CO., LTD.,** | |
| **Plaintiff,** | |
| **HYUNDAI STEEL COMPANY, HUSTEEL CO., LTD., AJU BESTEEL CO., LTD., MAVERICK TUBE CORPORATION, and SEAH STEEL CORPORATION,** | |
| **Consolidated Plaintiffs,** | |
| **and** | |
| **ILJIN STEEL CORPORATION,** | **Before: Jennifer Choe-Groves, Judge** |
| **Plaintiff-Intervenor,** | **Consol. Court No. 17-00091** |
| **v.** | **PUBLIC VERSION** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **TMK IPSCO, VALLOUREC STAR, L.P., WELDED TUBE USA INC., and UNITED STATES STEEL CORPORATION,** | |
| **Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the 2014–2015 administrative review of the antidumping duty order of oil country tubular goods from the Republic of Korea.]

Dated: January 2, 2019

Consol. Court No. 17-00091            PUBLIC VERSION                    Page 2

Henry D. Almond and Michael T. Shor, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., argued for Plaintiff NEXTEEL Co., Ltd. and Consolidated Plaintiff Hyundai Steel Company.  With them on the brief were Jaehong D. Park, Daniel R. Wilson, Kang W. Lee, and Sylvia Y.C. Chen.  Leslie C. Bailey also appeared.

Donald B. Cameron and Eugene Degnan, Morris, Manning & Martin, LLP, of Washington, D.C., argued for Consolidated Plaintiff Husteel Co., Ltd.  With them on the brief were Brady W. Mills, Julie C. Mendoza, Mary S. Hodgins, and Rudi W. Planert.

Robert E. DeFrancesco, III and Joshua Turner, Wiley Rein, LLP, of Washington, D.C., argued for Consolidated Plaintiff and Defendant-Intervenor Maverick Tube Corporation.  With them on the brief were Alan H. Price, Cynthia C. Galvez, Jeffrey O. Frank, John Lin, and Maureen E. Thorson.

Hardeep K. Josan, Attorney, U.S. Department of Justice, of New York, N.Y., argued for Defendant United States.  Of counsel on the brief was Mykhaylo A. Gryzlov, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance, of Washington, D.C.

Jeffrey M. Winton and Amrietha Nellan, Law Office of Jeffrey M. Winton PLLC, of Washington, D.C., argued for Consolidated Plaintiff SeAH Steel Corporation.

Jarrod M. Goldfeder and Robert G. Gosselink, Trade Pacific, PLLC, of Washington, D.C., appeared for Consolidated Plaintiff AJU Besteel Co., Ltd.

Joel D. Kaufman and Richard O. Cunningham, Steptoe & Johnson LLP, of Washington, D.C., appeared for Plaintiff Intervenor ILJIN Steel Corporation.

Roger B. Schagrin, Christopher T. Cloutier, Elizabeth J. Drake, John W. Bohn, and Paul W. Jameson, Schagrin Associates, of Washington, D.C., appeared for Defendant-Intervenor TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, D.C., appeared for Defendant-Intervenor United States Steel Corporation.  Formerly on the brief were Jeffrey D. Gerrish and Luke A. Meisner, Skadden Arps Slate Meagher & Flom, LLP, of Washington, D.C.

Choe-Groves, Judge:  This is a case of first impression, involving the first time that the

U.S. Department of Commerce ("Department" or "Commerce") found the existence of a

particular market situation in an administrative review under The Trade Preferences Extension

Act of 2015 ("TPEA").  Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL"), Consolidated Plaintiffs

Husteel Co., Ltd. ("Husteel"), Hyundai Steel Company ("Hyundai"), SeAH Steel Corporation

("SeAH"), AJU Besteel Co., Ltd. ("AJU Besteel"), and Maverick Tube Corporation

("Maverick") (collectively, "Consolidated Plaintiffs"), and Plaintiff-Intervenor ILJIN Steel

Corporation ("ILJIN") bring this consolidated action contesting Commerce's final results in the

2014–2015 administrative review of the antidumping duty order on oil country tubular goods

from the Republic of Korea ("Korea").  See Certain Oil Country Tubular Goods from the

Republic of Korea, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of

antidumping duty administrative review; 2014–2015), as amended, 82 Fed. Reg. 31,750 (Dep't

Commerce July 10, 2017) (amended final results of antidumping duty administrative review;

2014–2015) (collectively, "Final Results"); see also Issues and Decision Memorandum for the

Final Results of the 2014–2015 Administrative Review of the Antidumping Duty Order on

Certain Oil Country Tubular Goods from the Republic of Korea, A-580-870, (Apr. 10, 2017),

available at https://enforcement.trade.gov/frn/summary/korea-south/2017-07684-1.pdf (last

visited Dec. 19, 2018) ("Final IDM").  Before the court are seven Rule 56.2 motions for

judgment on the agency record filed by the Parties.  For the reasons discussed below, the court

sustains in part and remands in part Commerce's Final Results.

### ISSUES PRESENTED

The court reviews the following issues:

1. Whether Commerce's decision to apply a particular market situation

   adjustment to NEXTEEL's reported costs of production is supported by

   substantial evidence and in accordance with the law;

2. Whether Commerce's decision to adjust NEXTEEL's input costs based on a separate proceeding is supported by substantial evidence and in accordance with the law;

3. Whether Commerce's dumping margin calculation for non-examined companies is supported by substantial evidence and in accordance with the law;

4. Whether Commerce's constructed value profit rate calculations is supported by substantial evidence and in accordance with the law;

5. Whether Commerce's determination that NEXTEEL is affiliated with POSCO and POSCO Daewoo is supported by substantial evidence;

6. Whether Commerce's use of the differential pricing analysis is supported by substantial evidence and in accordance with the law;

7. Whether Commerce's classification of proprietary SeAH products is supported by substantial evidence;

8. Whether Commerce's decision to cap the adjustment for freight revenue on SeAH's U.S. sales is in accordance with the law;

9. Whether Commerce's decision to not make an adjustment for SeAH's ocean freight costs incurred on third-country sales is supported by substantial evidence;

10. Whether Commerce's deduction of general and administrative expenses as U.S. selling expenses is supported by substantial evidence;

11. Whether Commerce's adjustment to SeAH's reported costs when calculating cost of production is in accordance with the law;

12. Whether Commerce's decision to not apply adverse facts available ("AFA") to SeAH is supported by substantial evidence;

13. Whether Commerce's decision to not adjust SeAH's packing expenses is supported by substantial evidence; and

14. Whether Commerce's decision to not adjust SeAH's reported scrap and by-product data is supported by substantial evidence.

## BACKGROUND

Commerce published an antidumping duty order covering oil country tubular goods from Korea on September 10, 2014.  See Certain Oil Country Tubular Goods From India, the Republic of Korea, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders; and Certain Oil Country Tubular Goods From the Socialist Republic of Vietnam: Amended Final Determination of Sales at Less Than Fair Value, 79 Fed. Reg. 53,691 (Dep't Commerce Sept. 10, 2014).  Commerce issued an order allowing for administrative review requests of the antidumping duty order on September 1, 2015.  See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review, 80 Fed. Reg. 52,741 (Dep't Commerce Sept. 1, 2015); see also Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review: Certain Oil Country Tubular Goods from the Republic of Korea at 1, A-580-870, (Oct. 5, 2016), available at https://enforcement.trade.gov/frn/summary/korea-south/2016-24800-1.pdf (last visited Dec. 19, 2018) ("Prelim. IDM").  ILJIN, Hyundai, NEXTEEL, SeAH, Husteel, and AJU

Besteel requested an administrative review of the antidumping duty order.  See Prelim. IDM at

1–2.  Maverick Tube Corporation ("Maverick"), Energex Tube, a division of JMC Steel Group,

TMK IPSCO, Vallourec Star L.P., Welded Tube USA Inc., and United States Steel Corporation

submitted a petition for a review of various companies on September 29, 2015.  See id. at 2.

Commerce initiated an administrative review for the period covering July 18, 2014 through

August 31, 2015.  See id. at 1; see also Initiation of Antidumping and Countervailing Duty

Administrative Reviews, 80 Fed. Reg. 69,193 (Nov. 9, 2015).  Commerce selected the two

exporters or producers accounting for the largest volume of oil country tubular goods from Korea

during the period of review, which were NEXTEEL and SeAH.  See Prelim. IDM at 2.

　　　Commerce released the preliminary results on October 14, 2016.  See Certain Oil

Country Tubular Goods From the Republic of Korea, 81 Fed. Reg. 71,074 (Dep't Commerce

Oct. 14, 2016) (preliminary results of the antidumping duty administrative review; 2014–2015)

("Preliminary Results").  Commerce calculated a preliminary weighted-average dumping margin

of 8.04 percent for NEXTEEL, 3.80 percent for SeAH, and 5.92 percent for non-examined

companies.  See id. at 71,075.

　　　Maverick alleged that four[1] particular market situations existed in Korea with respect to

hot-rolled coil, which is the largest input used to produce oil country tubular goods.  Maverick

asserted the following:

---

[1] Maverick initially alleged the existence of three particular market situations, but later added a
fourth to the record.  See Department's Memorandum Pertaining to Maverick's Particular
Market Situation Allegations at 1–2, PD 531, bar code 3545522-01 (Feb. 22, 2017) ("Particular
Market Situation Mem.").

(1) The costs and prices of Korean hot-rolled coil were distorted due to subsidies provided by the Government of Korea.  Maverick pointed to the final determination in the countervailing duty investigation of Korean hot-rolled steel flat products to support its allegation.  <u>See</u> Department's Memorandum Pertaining to Maverick's Particular Market Situation Allegations at 2, PD 531, bar code 3545522-01 (Feb. 22, 2017) ("Particular Market Situation Mem.").

(2) The Korean market has been flooded with imports of cheaper, unfairly-traded Chinese hot-rolled flat products over the last three years, placing downward pressure on Korean domestic hot-rolled coil prices and causing price distortions.  <u>See</u> <u>id.</u>

(3) There existed "strategic alliances" between selected oil country tubular goods producers and two major hot-rolled coil suppliers in Korea, POSCO and Hyundai, in that POSCO and Hyundai allegedly provided favorable hot-rolled coil prices to certain oil country tubular goods producers while charging market prices to others not part of these alliances.  <u>See</u> <u>id.</u>

(4) The cost of electricity is influenced by the Government of Korea's alleged "pervasive intervention" in the production and distribution of electricity.  Once again, Maverick relied on the final determination in the separate countervailing duty investigation of Korean hot-rolled steel flat products to support its allegation.  <u>See</u> <u>id.</u> at 2–3.

Commerce released a memorandum on February 22, 2017, in which it addressed and rejected each allegation of a particular market situation individually.  <u>See</u> <u>id.</u>  Commerce concluded that there was insufficient evidence to support finding a particular market situation in the administrative review.  <u>See</u> <u>id.</u> at 14–18.

Commerce placed on the record a letter from Peter Navarro, Director of the National

Trade Council, on March 8, 2017.  See Memorandum to the File: E-mail from Peter Navarro,

"Recommendation for Action," Dated Mar. 2, 2017, PD 538, bar code 3549705-01 (Mar. 8,

2017).  The letter stated that Tenaris S.A., a multinational pipe-producing company

headquartered in Luxembourg, had completed an oil country tubular goods facility in Houston,

Texas, and low dumping margins in the oil country tubular goods administrative review "would

be particularly damaging" to the company.  Id. at 2.  Director Navarro noted that a minimum

thirty-six percent margin would assist Tenaris, and that Commerce should utilize the particular

market situation adjustment to meet that margin.  See id.

Commerce published the final results on April 17, 2017.  See Certain Oil Country

Tubular Goods From the Republic of Korea, 82 Fed. Reg. at 18,105.  In the final results,

Commerce reversed its prior position and found the existence of a particular market situation,

stating that it "reconsidered these four allegations as a whole, based on their cumulative effect on

the Korean [oil country tubular goods] market through the cost of [oil country tubular goods]

inputs."  Final IDM at 40.  Commerce "refocused the analysis on the totality of the conditions in

the Korean market" and found "that the allegations represent, instead, facets of a single particular

market situation."  Id.  Commerce assigned a weighted-average dumping margin of 24.92

percent to NEXTEEL, 2.76 percent to SeAH, and 13.84 percent to non-examined companies.

See Certain Oil Country Tubular Goods From the Republic of Korea, 82 Fed. Reg. at 18,106.

Commerce considered subsequent ministerial error allegations, which changed NEXTEEL's

weighted-average dumping margin to 29.76 percent.  See Certain Oil Country Tubular Goods

From the Republic of Korea, 82 Fed. Reg. at 31,751.  The final weighted-average dumping

margin for non-examined companies was 16.26 percent.  See id.

Plaintiff and Consolidated Plaintiffs initiated six separate actions against Defendant

("Government"), which the court consolidated.  See Order, Aug. 18, 2017, ECF No. 72.

Plaintiff, Consolidated Plaintiffs, and Plaintiff-Intervenor filed seven Rule 56.2 motions for

judgment on the agency record, challenging various aspects of Commerce's Final Results.  See

Pl.-Intervenor Rule 56.2 Mot. J. Agency R., Oct. 12, 2017, ECF No. 76; Br. Pl.-Intervenor ILJIN

Steel Corp. Supp. Mot. J. Agency R., Oct. 12, 2017, ECF No. 77; Mot. Pl. SeAH Steel Corp. J.

Agency R., Oct. 12, 2017, ECF No. 80; Br. SeAH Steel Corp. Supp. Rule 56.2 Mot. J. Agency

R., Oct. 12, 2017, ECF No. 79 ("SeAH Br."); Rule 56.2 Mot. J. Agency R. Consolidated Pl.

Hyundai Steel Co., Oct. 12, 2017, ECF No. 82; Mem. Supp. Consolidated Pl. Hyundai Steel

Co.'s Rule 56.2 Mot. J. Agency R., Oct. 12, 2017, ECF No. 82-1 ("Hyundai Br."); Pl.-Intervenor

Husteel Co., Ltd.'s Mot. J. Agency R., Oct. 12, 2017, ECF No. 83; Pl.-Intervenor Husteel Co.,

Ltd.'s Br. Supp. Mot. J. Agency R., Oct. 12, 2017, ECF No. 83-1; Consolidated Pl.'s Rule 56.2

Mot. J. Agency R., Oct. 12, 2017, ECF No. 84; Mem. Supp. Mot. Consolidated Pl., AJU Besteel

Co., Ltd., J. Agency R., Oct. 12, 2017, ECF No. 84-1; Rule 56.2 Mot. J. Agency R., Pl.

NEXTEEL Co., Ltd., Oct. 13, 2017, ECF No. 87; Mem. Supp. Pl. NEXTEEL Co., Ltd.'s Rule

56.2 Mot. J. Agency R., Oct. 13, 2017, ECF No. 87-1 ("NEXTEEL Br."); Consolidated Pl.

Maverick Tube Corp.'s Rule 56.2 Mot. J. Agency R., Oct. 13, 2017, ECF No. 89; Mem.

Consolidated Pl. Maverick Tube Corp. Supp. Mot. J. Agency R., Oct. 13, 2017, ECF No. 89

("Maverick Br.").  The court held oral argument on October 18, 2018.  See Oral Argument, Oct.

18, 2018, ECF No. 136; <u>see also</u> Transcript of Oral Argument, Nov. 5, 2018, ECF No. 137

("Oral Arg. Tr.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) (2012)[2] and 28

U.S.C. § 1581(c), which grant the court the authority to review actions contesting the final

results of an administrative review of an antidumping duty order.  The court will uphold

Commerce's determinations, findings, or conclusions unless they are unsupported by substantial

evidence on the record, or otherwise not in accordance with the law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence "means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  <u>A.L. Patterson, Inc. v. United States</u>, 585

Fed. Appx. 778, 781–82 (Fed. Cir. 2014) (quoting <u>Consol. Edison Co. of N.Y. v. NLRB</u>, 305

U.S. 197, 229 (1938)).

## ANALYSIS

### I.      Particular Market Situation Adjustment

For the first time under Section 504 of the TPEA, Commerce found the existence of a

particular market situation in this case.

Maverick alleged the existence of four particular market situations in the administrative

review.  Commerce found initially that none of the four alleged particular market situations

---

[2] All further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of
Title 19 of the U.S. Code.  All further citations to the U.S. Code are to the 2012 edition, with
exceptions.  All further citations to 19 U.S.C. § 1677b(e) are to the 2015 version, as amended
pursuant to The Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, 129 Stat. 362
(2015).  All citations to the Code of Federal Regulations are to the 2017 edition.

existed based on the evidence on the record.  Commerce reversed its position in the <u>Final Results</u>, stating that the four allegations "as a whole, based on their cumulative effect on the Korean [oil country tubular goods] market through the cost of [oil country tubular goods] inputs," created the existence of a single particular market situation.

NEXTEEL, Hyundai, Husteel, SeAH, AJU Besteel, and ILJIN contest Commerce's finding of a particular market situation in the <u>Final Results</u>.  NEXTEEL argues that a finding of a particular market situation is reserved for "extreme circumstances," and that Commerce's application here is inconsistent with the statute and Commerce's previous applications of a particular market situation under 19 U.S.C. § 1677b(a)(1)(C)(iii).  <u>See</u> NEXTEEL Br. 14–15. Maverick, TMK IPSCO, Vallourec Star, L.P., Welded Tube USA Inc., and United States Steel Corporation argue that Commerce properly found the existence of one particular market situation.  <u>See</u> Maverick Br. 11–31.  The Government fails to defend Commerce's finding, both in its briefing and at oral argument, and instead requests a voluntary remand.  <u>See</u> Def. Resp. 64– 65; Oral Arg. Tr. at 52:11–54:8.  For the following reasons, the court denies the Government's request for a voluntary remand and concludes that Commerce's finding of a particular market situation is unsupported by substantial evidence.

### A. The Government's Request for a Voluntary Remand

The Government contends that a voluntary remand is appropriate to "further consider and address certain arguments that were not directly addressed in the underlying decision" without confessing error.  Def. Resp. 65; <u>see also</u> <u>SKF USA, Inc. v. United States</u>, 254 F.3d 1022, 1028– 29 (Fed. Cir. 2001).  The Government's request is contested.  <u>See</u> Reply Br. Pl.-Intervenor ILJIN Steel Corp. Supp. Mot. J. Agency R. 10, Mar. 6, 2018, ECF No. 108; Pl.-Intervenor Husteel Co.,

Ltd.'s Reply Br. Supp. Mot. J. Agency R. 2–7, Mar. 6, 2018, ECF No. 109; Consolidated Pl.

Hyundai Steel Co.'s Reply Br. Supp. Mot. J. Agency R. 4, Mar. 6, 2018, ECF No. 110; Pl.

NEXTEEL Co., Ltd.'s Reply Br. Supp. Mot. J. Agency R. 1–7, Mar. 6, 2018, ECF No. 112;

Reply Br. SeAH Steel Corp. 1–4, Mar. 6, 2018, ECF No. 113 ("SeAH Reply"); Reply Br.

Consolidated Pl. AJU Besteel Co., Ltd. 2, Mar. 6, 2018, ECF No. 114.

      The court has discretion in deciding requests for voluntary remand on the basis of further

agency consideration and may deny the request if it is frivolous or made in bad faith. SKF USA,

Inc., 254 F.3d at 1029.  Vague and unsupported requests for remand are insufficient. Corus Staal

BV v. U.S. Dep't of Commerce, 27 CIT 388, 391–95, 259 F. Supp. 2d 1253, 1257–60 (2003);

see also Corus Staal BV v. United States, 29 CIT 777, 781–83, 387 F. Supp. 2d 1291, 1296–97

(2005) ("The Government must give due regard to finality and cannot simply ask for a do-over

any time it wishes.").  An agency is not allowed to proffer an ad hoc rationalization for its

actions.  See Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947).  The

Government's request here is vague, overly broad, and does not specify what arguments were

"not directly addressed" in Commerce's Final Results.  Apparently the Government is seeking a

"do-over" with respect to the particular market situation issue.  Accordingly, the court denies the

Government's request for a voluntary remand.

      In addition, it is well established that arguments that are not appropriately developed in a

party's briefing may be deemed waived.  United States v. Great Am. Ins. Co. of N.Y., 738 F.3d

1320, 1328 (Fed. Cir. 2013); see also JBF RAK LLC v. United States, 38 CIT __, __, 991 F.

Supp. 2d 1343, 1356 (2014), aff'd, 790 F.3d 1358 (Fed. Cir. 2015).  The Government has not put

forth any substantive arguments regarding Commerce's finding of a particular market situation. The court concludes that the Government has waived its right to argue the issue on the merits.

### B.  Commerce's Finding of a Particular Market Situation

Under the Tariff Act of 1930, as amended, Commerce conducts antidumping duty investigations and determines whether goods are being sold at less-than-fair value.  See 19 U.S.C. § 1673.  If the Department finds that subject merchandise is being sold at less-than-fair value, and if the U.S. International Trade Commission finds that these less-than-fair value imports materially injure a domestic industry, the Department issues an antidumping duty order imposing antidumping duties equivalent to "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  Id.  Generally, export price is defined as the price at which the subject merchandise is first sold in the United States, whereas the normal value represents the price at which the subject merchandise is sold in the exporting country.  See id. §§ 1677a(a), 1677b(b)(i).  If Commerce cannot determine the normal value of the subject merchandise based on price, then the statute authorizes Commerce to calculate a constructed value.  Id. § 1677b(a)(4).  The constructed value shall be an amount equal to the sum of, for instance, "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade."  Id. § 1677b(e)(1).

Section 504 of the TPEA amended the Tariff Act to allow Commerce to consider certain sales and transactions to be outside of the ordinary course of trade when "the particular market situation prevents a proper comparison with the export price or constructed export price."  19 U.S.C. § 1677(15).  When calculating constructed value under the revised version of the statute,

if Commerce finds the existence of a particular market situation "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology."  19 U.S.C. § 1677b(e).

The legislative history of the TPEA reflects a desire to give Commerce the ability to choose the appropriate methodology when a particular market situation exists.  One Senate Report stated that modifications to the Tariff Act under the TPEA "provide that where a particular market situation exists that distorts pricing or cost in a foreign producer's home market, the Department of Commerce has *flexibility* in calculating a duty that is not based on distorted pricing or costs."  S. Rep. No. 114–45, at 37 (2015) (emphasis added).  In a hearing before the House of Representatives, Senator Patrick Meehan noted that under the TPEA, Commerce would be "empowered . . . to disregard prices or costs of inputs that foreign producers purchase if the Department of Commerce has reason to believe or suspects that the inputs in question have been subsidized or dumped" in the interest of creating an accurate record and protecting domestic workers.  166 Cong. Rec. H4690 (daily ed. June 25, 2015) (statement of Sen. Meehan).

Commerce has the ability to choose the appropriate methodology so long as it comports with its statutory mandate and provides a reasoned explanation.  See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1993) ("State Farm"); Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996).  The statute's language and legislative history permit Commerce's chosen methodology in this investigation, which was to consider allegations of a particular market situation based on the cumulative effect and the

totality of the conditions in the foreign market.  The court concludes that Commerce's particular

market situation approach was reasonable in theory.

### C.  Record Evidence

Commerce failed, however, to substantiate its finding of one particular market situation

with evidence on the record.  Commerce explained in a nineteen-page memorandum how the

voluminous information on the record showed that Maverick's four allegations were unfounded.

See Particular Market Situation Mem.  After the issuance of Commerce's memorandum and

before the issuance of its Final Results, Commerce did not receive any new evidence regarding

conditions in the Korean market.  Commerce did not explain adequately how the same record

supported both its previous conclusion of no particular market situation and its subsequent

finding of a single particular market situation.  Compare Particular Market Situation Mem. at 14–

18 with Final IDM at 40–44.  The Government did not defend Commerce's Final Results at oral

argument or in its briefs, choosing instead to refrain from making any argument at all with

respect to the particular market situation.

First, Maverick alleged that the Korean Government subsidized the production of hot-

rolled coil and submitted documents from Commerce's countervailing duty investigation on hot-

rolled coil in support of its contention.  The Department noted that "Maverick did not identify

any specific findings in these documents or evidence from that proceeding that would lead the

Department to find that a particular market situation exists," but instead "merely referred to these

documents to assert that the Department made a final affirmative subsidy determination and to

reference the resulting [countervailing duty] rates."  Particular Market Situation Mem. at 14.

Commerce found Maverick's evidence unpersuasive and concluded, "The record does not

contain evidence that the Government of Korea has introduced policies or mandates with regard

to [hot-rolled coil] that distort the cost to produce the subject merchandise for either NEXTEEL

or SeAH."  Id. at 15.

Second, Maverick asserted that a particular market situation exists because an influx of

Chinese hot-rolled flat products into the Korean market caused the price of Korean hot-rolled

coil products to fall dramatically.  Id.  Commerce acknowledged a rise in exports of steel

products (including hot-rolled coil) from China, but found that Maverick had not demonstrated

that the trend was unique to Korea.  See id. ("The potential broad effect on prices creates a

situation outside the scope of a particular market situation, as the impact of Chinese exports in

the Korean market are also reflected in other markets across the world.").  Commerce determined

that there was no record evidence of specific price distortions in the Korean market as a result of

Chinese imports, and no record evidence to support a finding of a particular market situation

with respect to NEXTEEL and SeAH.  See id. at 15–16.

Third, Maverick alleged that "strategic alliances" between Korean hot-rolled coil

suppliers and oil country tubular goods producers resulted in favorable pricing and therefore

constituted a particular market situation.  See id. at 16.  Maverick provided an affidavit in

support of its allegation, which Commerce discounted because it pertained to discussions that

occurred before the period of review and did not contain information about specific agreements.

See id.  Maverick also pointed to the fact that NEXTEEL and SeAH purchased hot-rolled coil

from POSCO during the period of review as indicative of a "strategic alliance."  See id. at 17.

Commerce did not find this evidence persuasive because POSCO is a major supplier of hot-

rolled coil in Korea and because NEXTEEL and SeAH also purchased hot-rolled coil from other

suppliers.  See id.  Commerce determined that the record did not support Maverick's allegation of a particular market situation.

Fourth, Maverick alleged that a particular market situation existed due to the Korean Government's "pervasive intervention" in the electricity market that distorted the price of electricity, citing Commerce's final determination in the countervailing duty investigation of hot-rolled steel flat products from Korea.[3]  See id. at 17.  Commerce found that the record showed government involvement in Korea's electricity sector, but "there is no evidence to suggest that electricity prices charged to producers of either [hot-rolled coil] or [oil country tubular goods] Korea do not reasonably reflect the cost of production for the electricity or are otherwise anomalous."  Id. at 18.  Commerce declined to find the existence of a particular market situation in Korea based on the electricity sector.

Commerce found that the record did not support any of Maverick's four allegations of a particular market situation in Korea.  The court finds it unreasonable that Commerce reversed its

---

[3] Commerce found in the countervailing duty investigation of hot-rolled steel flat products from Korea that the Government of Korea's provision of electricity was not for less than adequate remuneration, and the determination was upheld by this Court.  See POSCO v. United States, Slip Op. 18-117, 2018 WL 4352100 (Sept. 11, 2018).  Commerce has made similar findings regarding the Government of Korea's provision of electricity in countervailing duty investigations for other steel products, which have also been upheld by this Court.  See, e.g., POSCO v. United States, Slip Op. 18-169, 2018 WL 6436440 (Dec. 6, 2018) (sustaining in part Commerce's investigation of certain carbon and alloy steel cut-to-length plate from Korea); POSCO v. United States, 42 CIT at __, 296 F. Supp. 3d 1320 (sustaining in part Commerce's countervailing duty investigation of cold-rolled steel flat products from Korea); Nucor Corp. v. United States, 42 CIT __, 286 F. Supp. 3d 1364 (2018), appeal docketed, No. 18- 1787 (Fed. Cir. Apr. 6, 2018) (sustaining Commerce's countervailing duty investigation of certain corrosion-resistant steel products from Korea); Maverick Tube Corp. v. United States, 41 CIT __, 273 F. Supp. 3d 1293 (2017), appeal docketed, No. 18-1351 (Fed. Cir. Dec. 28, 2017) (sustaining Commerce's countervailing duty investigation of welded line pipe from Korea).

position and subsequently found a particular market situation based on the same evidence.  It does not stand to reason that individually, the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion.  The court concludes that Commerce's determination of the existence of one particular market situation in Korea is unsupported by substantial evidence.  Commerce is instructed to reverse the finding of a particular market situation and recalculate the dumping margin for the mandatory respondents and non-examined companies.

## II.    Adjustment to NEXTEEL's Input Costs Based on a Separate Proceeding

As a result of its finding of a particular market situation, Commerce adjusted NEXTEEL's input costs based on a separate administrative proceeding: Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) (final affirmative determination), as amended, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (amended final affirmative countervailing duty determination and countervailing duty order).  Commerce calculated the respondent's countervailing duty rate based on an application of total AFA in that proceeding.  NEXTEEL argues that, in applying this countervailing duty rate, Commerce applied AFA to NEXTEEL without any of the procedural safeguards or requisite findings on the record.

Because the court directs Commerce to reverse its finding of a particular market situation and recalculate the dumping margins, the court does not address this issue at this time.

### III.      Dumping Margin Calculation for Non-Examined Companies

As discussed *supra*, Commerce calculated NEXTEEL's dumping margin based on the

AFA rate in a separate administrative proceeding.  NEXTEEL's dumping margin, in turn,

formed the basis for the all-others rate, which applies to Hyundai, Husteel, and AJU Besteel.

Hyundai, Husteel, and AJU Besteel argue that Commerce's application of a total AFA

rate derived from a separate proceeding was inappropriate, unfairly prejudiced non-examined

companies, and is contrary to law.  See Hyundai Br. 8–9 (citing Albemarle Corp. v. United

States, 821 F.3d 1345, 1354 (Fed. Cir. 2016)).  In applying the total AFA rate, the Parties argue

that Commerce *de facto* applied AFA to the non-examined companies without making the

necessary findings, and thus the rate for non-examined companies is not supported by substantial

evidence on the record.  See id.

Because the court directs Commerce to reverse its finding of a particular market situation

and recalculate the dumping margins, it does not address this issue at this time.

### IV.      Constructed Value Profit Rate Calculations

When Commerce is required to calculate a constructed value for a respondent, the statute

requires Commerce to utilize the respondent's actual selling expenses and profits from the home

market or a third-country market.  19 U.S.C. § 1677b(e)(2)(A).  If that data is unavailable, the

statute provides Commerce with three alternatives:

> (i)      the actual amounts incurred and realized by the specific exporter or
> producer being examined in the investigation or review for selling, general,
> and administrative expenses, and for profits, in connection with the
> production and sale, for consumption in the foreign country, of merchandise
> that is in the same general category of products as the subject merchandise,
>
> (ii)     the weighted average of the actual amounts incurred and realized by
> exporters or producers that are subject to the investigation or review (other

> than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii)    the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Id. § 1677b(e)(B).

In calculating NEXTEEL's constructed value, Commerce determined that NEXTEEL did not have a viable home or third-country market during the period of review for the purposes of calculating constructed value profits and selling expenses.  See Final IDM at 9.  When evaluating the statutory alternatives, Commerce found that subsection (i) was unreliable because other steel products produced by NEXTEEL were not in the same general category of products as oil country tubular goods.  See id. at 11.  Subsection (ii) was unavailable because no sales of oil country tubular goods existed in the home market, Korea.  See id.  Commerce chose subsection (iii).  See id.  Of the four sources of information on the record identified by Commerce, Commerce chose to calculate SeAH's constructed value profit by utilizing profit data associated with SeAH's Canadian market sales, costs, selling, and general expenses.  See id.

NEXTEEL argues that Commerce's use of SeAH's data is inappropriate because of an existing antidumping duty case in Canada regarding oil country tubular goods from Korea.  See NEXTEEL Br. 37.  Although there is a preference for not using "dumped third country prices to calculate" normal value, there was no evidence of a formal finding of dumping in the Canadian investigation.  See Alloy Piping Prods., Inc. v. United States, 26 CIT 330, 341, 201 F. Supp. 2d

1267, 1277 (2002) (sustaining Commerce's decision to rely on data derived from allegedly

dumped merchandise in third-country sales).  Commerce "subjected SeAH's Canadian market

sales to the cost test, and only those sales that were above the cost of production (*i.e.*, made in

the ordinary course of trade) were used in constructing the aggregate [constructed value] profit

and selling expenses."  Final IDM at 13.  Commerce attempted to make adjustments for possible

distortions and to utilize the best available information on the record to calculate NEXTEEL's

constructed value profit.  The court finds that Commerce's use of SeAH's Canadian market sales

was reasonable.

NEXTEEL contends that Commerce should have instead considered other sources on the

record, including the 2014 financial statements of Korean pipe producer Hyundai HYSCO, a

producer of oil country tubular goods in the instant administrative review and other steel pipe

products.  See NEXTEEL Br. 38.  Commerce evaluated information placed on the record and

concluded that using data from other Korean pipe producers was inappropriate because those

products were not in the same general category of products as the merchandise subject to the

administrative review.  See Final IDM at 12.  In comparing Hyundai HYSCO's data to SeAH's,

Commerce found that SeAH's data was more precise and therefore preferable.  See id.  The court

concludes that Commerce's decision to utilize SeAH's Canadian market sales data to calculate

NEXTEEL's constructed value profit rate is supported by substantial evidence and in accordance

with the law.

### V.    NEXTEEL's Alleged Affiliation with POSCO and POSCO Daewoo

Commerce determined that NEXTEEL and POSCO, which is NEXTEEL's supplier of

steel coil, were affiliated within the meaning of 19 U.S.C. § 1677(33)(G).  See Final IDM at

126–27.  Commerce found that NEXTEEL and POSCO Daewoo, which is wholly-owned by

POSCO, were affiliated within the meaning of 19 U.S.C. § 1677(33)(F).  See id.  NEXTEEL

sources hot-rolled coil from POSCO and sells oil country tubular goods to POSCO Daewoo.  See

id. at 127.  Commerce cited its own regulation, 19 C.F.R. § 351.102, and explained, "POSCO is

involved in both the production and sales sides of NEXTEEL's operations involving subject

merchandise," which "creates a unique situation where POSCO is operationally in a position to

exercise restraint or direction over NEXTEEL in a manner that affects the pricing, production,

and sale of" oil country tubular goods.  Id.  The potential to exercise control is sufficient;

Commerce need not find actual control.  See id.

> The statute defines "affiliated persons" as follows:
>
> (F)  Two or more persons directly or indirectly controlling, controlled by, or
>       under common control with, any person.
>
> (G)  Any person who controls any other person and such other person.
>
> For purposes of this paragraph, a person shall be considered to control another
> person if the person is legally or operationally in a position to exercise restraint or
> direction over the other person.

19 U.S.C. § 1677(33).  When determining whether control over another person exists within the

meaning of the statute, Commerce will consider the following factors, among others:

> Corporate or family groupings; franchise or joint venture agreements; debt
> financing; and close supplier relationships.  [Commerce] will not find that control
> exists on the basis of these factors unless the relationship has the potential to impact
> decisions concerning the production, pricing, or cost of the subject merchandise or
> foreign like product.  [Commerce] will consider the temporal aspect of a
> relationship in determining whether control exists; normally, temporary
> circumstances will not suffice as evidence of control.

19 C.F.R. § 351.102(b)(3).

NEXTEEL contends that Commerce's finding was premised on its prior decision in the initial antidumping duty investigation.  See NEXTEEL Br. 40.  NEXTEEL argues that Commerce should have reevaluated its position in light of differing facts; specifically, that NEXTEEL sourced fewer hot-rolled coils from POSCO and sold fewer oil country tubular goods to POSCO Daewoo compared to other suppliers and customers.[4]  See id. at 41.  "Despite changes to the percentages of NEXTEEL's purchases from, and sales to, POSCO and POSCO's affiliates," Commerce found that the numbers still represented a majority of NEXTEEL's sourcing and sales.  Final IDM at 127.  Commerce determined, based on the data, that POSCO and POSCO Daewoo were in a position to control NEXTEEL in a way that extended beyond a close supplier relationship.  See id.  It was reasonable for Commerce to find that NEXTEEL is affiliated with POSCO and POSCO Daewoo based on NEXTEEL's souring and sales information, and the court concludes that Commerce's determination is supported by substantial evidence.

## VI.    Differential Pricing Analysis

Commerce ordinarily uses an average-to-average comparison ("A-to-A") of normal values to export prices for comparable merchandise in an investigation when calculating a dumping margin.  See 19 U.S.C. § 1677f-1(d)(1)(A); 19 C.F.R. § 351.414(c)(1).  Commerce can

---

[4] In the initial investigation, NEXTEEL sourced [[      ]] percent of its hot-rolled coils from POSCO, and [[      ]] percent of NEXTEEL's U.S. sales of oil country tubular goods were made through POSCO Daewoo (which was, at that time, known as Daewoo International, or DWI). See NEXTEEL's Supplemental Section C Response at 3, Exhibit SC-5, CD 171, bar code 3476956-01 (June 9, 2016).  In the 2014–2015 administrative review, NEXTEEL reported that POSCO provided [[      ]] percent of its hot-rolled coil supply and that it sold [[      ]] percent of its oil country tubular goods to POSCO Daewoo.  See id. at 4, Exhibit SC-4.

depart from using the A-to-A methodology and instead compare the weighted average of normal

values to the export prices of individual transactions for comparable merchandise ("A-to-T")

when (1) Commerce finds a pattern of export prices for comparable merchandise that differ

significantly among purchasers, regions, or periods of time and (2) Commerce explains why such

differences cannot be taken into account using the A-to-A methodology.  See 19 U.S.C. § 1677f-

1(d)(1)(B)(i)-(ii).  Commerce has adopted the same basis for applying its A-to-T methodology in

administrative reviews.  See JBF RAK LLC, 790 F.3d at 1364 ("Commerce's decision to apply

its average-to-transaction comparison methodology in the context of an administrative review is

reasonable.").  Commerce applied differential pricing analysis in this case when applying its A-

to-T methodology.  See Final IDM at 18.

  Commerce determines whether a pattern of significant price differences exists among

purchasers, regions, or periods of time with its two-stage differential pricing analysis.  See

Prelim. IDM at 8–9.  First, Commerce applies what it refers to as the "Cohen's d test" which

measures the degree of price disparity between two groups of sales.  See id. at 8.  Commerce

calculates the number of standard deviations by which the weighted-average net prices of U.S.

sales for a particular purchaser, region, or time period (the "test group") differ from the

weighted-average net prices of all other U.S. sales of comparable merchandise (the "comparison

group").  See id.  The result of this calculation is a coefficient.  See id.  The Cohen's d

coefficient is used to evaluate the extent to which the net prices to a particular purchaser, region,

or time period differ significantly from the net prices of all other sales of comparable

merchandise.  See id.  A group of sales with a coefficient equal to or greater than 0.8 "passes"

the test and signifies to Commerce that a significant pattern of price differences exists within that

group of sales.  See id. at 8–9.  Commerce then applies the "ratio test" to measure the extent of

significant price differences.  See id. at 9.  If the value of sales that pass the Cohen's d test

account for 66 percent or more of the value of total sales, that indicates to Commerce that the

pattern of significant price differences warrants application of the A-to-T method to all sales.

See id.  If the value of sales that pass the Cohen's d test is more than 33 percent and less than 66

percent of the value of all sales, Commerce takes a hybrid approach, applying the A-to-T method

to the sales that passed its Cohen's d test and applying the A-to-A method to all other sales.  See

id.  Commerce will apply the A-to-A method to all sales if 33 percent or less of a respondent's

total sales pass its Cohen's d test.  See id.  If both the Cohen's d test and ratio test demonstrate

that the A-to-T methodology should be considered, Commerce applies its "meaningful

difference" test, pursuant to which Commerce evaluates whether the difference between the

weighted-average dumping margins calculated by the A-to-A method is meaningfully different

than the weighted-average dumping margins calculated by the A-to-T method.  See id.

### A.  Commerce's Use of Numerical Thresholds Throughout the Differential Pricing Analysis

The Court of Appeals for the Federal Circuit and this Court have held the steps

underlying the differential pricing analysis as applied by Commerce to be reasonable.  See e.g.,

Apex Frozen Foods Private Ltd. v. United States, 40 CIT __, __, 144 F. Supp. 3d 1308, 1313–35

(2016), aff'd, 862 F.3d 1337 (Fed. Cir. 2017); Apex Frozen Foods Private Ltd. v. United States,

208 F. Supp. 3d. 1398 (2017); Tri Union Frozen Prods., Inc. v. United States, 40 CIT __, __, 163

F. Supp. 3d 1255, 1303 (2016).  Commerce's use of the differential pricing analysis was not

subject to the notice and comment requirements of the Administrative Procedure Act.  See Apex

Frozen Foods Private Ltd., 40 CIT __, __, 144 F. Supp. 3d at 1321.

SeAH contends that record evidence does not support Commerce's use of the differential

pricing analysis here.  See SeAH Br. 2–3.  Specifically, SeAH argues that Commerce must

explain why its differential pricing analysis application and why any of the numerical thresholds

used during the analysis are appropriate in the context of each specific case.  See SeAH Br. 11.

SeAH cites Carlisle Tire & Rubber Co., Div. of Carlisle Corp. v. United States, 10 CIT 301, 634

F. Supp. 419 (1986) ("Carlisle Tire"), and Washington Red Raspberry Commission v. United

States, 859 F.2d 898 (Fed. Cir. 1988) ("Wash. Red. Raspberry Comm'n"), as support for the

proposition that Commerce can only apply mathematical assumptions and numerical thresholds

that have not been adopted in accordance with the Administrative Procedure Act if the record

contains substantial evidence supporting the application.  See SeAH Br. 12–13.  Both cases

concerned only Commerce's application of the 0.5 percent de minimis standard in antidumping

investigations and can be distinguished from the instant case.  See Wash. Red Raspberry

Comm'n, 859 F.2d at 902; Carlisle Tire, 10 CIT at 302, 634 F. Supp. at 421.  The de minimis

standard needed to be promulgated in accordance with the notice and comment provisions of the

Administrative Procedure Act.  See Carlisle Tire, 10 CIT at 305, 634 F.Supp. at 423.  That is not

true of Commerce's differential pricing analysis.  See Apex Frozen Foods Private Ltd., 40 CIT at

__, 144 F. Supp. 3d at 1321 ("Commerce's shift from the Nails test to the differential pricing

analysis is not subject to notice and comment requirements.")  Because there is not support for

SeAH's argument that Commerce can only apply mathematical assumptions and numerical

thresholds that have not been adopted in accordance with the Administrative Procedure Act if the

record contains substantial evidence supporting the application, the court need not disturb
Commerce's practice.

### B.  Commerce's Use of the Cohen's d Test

The Court gives Commerce deference in determinations "involv[ing] complex economic
and accounting decisions of a technical nature."  See Fujitsu Gen. Ltd., 88 F.3d at 1039.  When
Commerce applies the Cohen's d test, all of the respondent's sales are analyzed.  See Prelim.
IDM at 8.  Sampling technique, sample size, and statistical significance are not relevant
considerations in the context of analyzing all sales.  See Tri Union Frozen Prods., 40 CIT at __,
163 F. Supp. 3d at 1302.

SeAH contends that Commerce's use of the Cohen's d test is contrary to well-recognized
statistical principles.  See SeAH Br. 13–15.  Specifically, SeAH argues that the Cohen's d test
can only be used when comparing random samples drawn from normal distributions with
roughly equal variance containing a sufficient number of data points.  See id. at 13.  During the
review, Commerce explained that "the U.S. sales data which SeAH has reported to the
Department constitutes a population . . . .  As such, sample size, sample distribution, and the
statistical significance of the sample are not relevant to the Department's analysis."  Final IDM
at 24.  Commerce explained its use of the Cohen's d test in this case and did not need to consider
sample size, sample distribution, and the statistical significance of the sample, and therefore the
court finds that Commerce's approach is supported by substantial evidence on the record.

### C.  The "Ratio Test" Thresholds

The thresholds in the ratio test have previously been upheld by this Court as reasonable
and in accordance with the law.  See e.g., U.S. Steel Corp. v. United States, 41 CIT __, __, 219

F. Supp. 3d 1300, 1311 (2017) (Commerce "has reasonably explained why its ratio test is reasonable and not arbitrarily applied."). If Commerce's rationale for adopting such thresholds is reasonably explained, the standard of review does not require that Commerce explain the statistical calculations and methodologies that allowed it to arrive at such thresholds. See U.S. Steel Corp. v. United States, 40 CIT __, __ 179 F. Supp. 3d 1114, 1126 (2016) (citing State Farm, 463 U.S. at 48–49).

SeAH contends that Commerce failed to provide any evidence or reasonable explanation to support the 33 and 66 percent thresholds used in the "ratio test" portion of the differential pricing analysis. See SeAH Br. 16–17. Commerce explained that "when a third or less of a respondent's U.S. sales are not at prices that differ significantly, then these significantly different prices are not extensive enough to satisfy the first requirement of the statute," which requires Commerce to find a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or period of time. See Final IDM at 25. Commerce explained further that "when two thirds or more of a respondent's sales are at prices that differ significantly, then the extent of these sales is so pervasive that it would not permit the Department to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly." Id. When Commerce "finds that between one third and two thirds of U.S. sales are at prices that differ significantly, then there exists a pattern of prices that differ significantly, and that the effect of this pattern can reasonably be separated from the sales whose prices do not differ significantly." Id. As in United States Steel Corporation, the court can discern that Commerce developed its ratio test to identify the existence and extent to which there is a pattern of export prices for comparable merchandise that differ significantly among

purchasers, regions, or periods of time.  See U.S. Steel Corp., 40 CIT at __, 179 F. Supp. 3d at

1127.  The court finds that Commerce's use of the 33 and 66 percent thresholds in the ratio test is

supported by evidence on the record.

> ### D.  Commerce's Explanation of Why the Alleged Pattern Could Not Be Taken into Account by the A-to-A Comparison

The Court of Appeals for the Federal Circuit has held that Commerce's use of the

"meaningful difference analysis," through which Commerce evaluates whether the difference

between the weighted-average dumping margins calculated by the A-to-A method is

"meaningfully" different than the weighted-average dumping margins calculated by the A-to-T

method, is reasonable.  See Apex Frozen Foods Private Ltd., 862 F.3d at 1347–48.

SeAH contends that Commerce failed to satisfy its statutory burden of explaining why

the alleged pattern of price differences could not be taken into account by the normal A-to-A

comparison.  See SeAH Br. 18–21.  Specifically, SeAH argues that Commerce is required to

explain how substantial evidence on the record provides a factual basis for concluding that the

results of the A-to-T calculation are more accurate than the results of the A-to-A calculation in

this specific case.  See id. at 19.  In the Final Results, Commerce explained that the comparison

of the results using the A-to-T method versus the A-to-A method sheds light on whether use of

the A-to-A method can account for SeAH's significant prices differences.  See Final IDM at 26.

Because Commerce's meaningful difference analysis is reasonable and Commerce explained that

the A-to-A method could not account for the significant price differences in SeAH's pricing

behavior, the court finds that Commerce's use of the A-to-T method is supported by evidence on

the record.

### VII.   Classification of Proprietary SeAH Products

Commerce's initial questionnaire in the investigation asked SeAH to report a separate

reporting code for proprietary grades of oil country tubular goods that are not listed in the API

Specification 5CT.  SeAH informed Commerce that it sold three proprietary grades of oil

country tubular goods in the United States during the period of review that had "the same tensile

strength required by the N-80 specification but is not heat treated (by normalization or by

quenching-and-tempering) in the manner required by the N-80 norms."  SeAH's Initial Section

B–E Response at 8 n.4, PD 140, bar code 3454399-02 (Mar. 31, 2016).  In the Preliminary

Results and in the Final Results, Commerce combined SeAH's reported code 075 with code 080,

which represented products meeting Commerce's N-80 specification.  See Final IDM 96–97.

Commerce found that because SeAH's proprietary oil country tubular goods shared the same

mechanical properties as goods coded under 080 (i.e., tensile and hardness requirements), the

two goods should be grouped together.  See id. at 96.  "Any differences between these grades

were already captured in other product characteristics."  Id.

SeAH argues that Commerce's grouping of its proprietary oil country tubular goods into

code 080 was improper because its proprietary product does not meet the heat treatment

specification required for N-80 goods.  See SeAH Br. 28–32; see also SeAH's Initial Section A

Response, App. A-10, CD 68, bar code 3450296-12 (Mar. 18, 2016) (API 5CT specification for

heat treatment, stating that grade N-80 goods "shall be normalised or, at the manufacturer's

option, shall be normalised and tempered.").  The Government contends that "heat treatment is

not a 'physical characteristic' of a product but rather a 'production process' feature."  Def. Resp.

35.  The Government urges the court to sustain Commerce's finding as reasonable because while

SeAH's proprietary oil country tubular goods differ from grade N-80 goods with respect to heat treatment, "they are the same with regard to critical performance properties." Id.

Despite the Government's arguments, Commerce failed to distinguish meaningfully between a product's physical characteristics and production process in the Final Results. The API 5CT specification implies that heat treatment influences a product's specifications and classification under the N-80 grade. Commerce did not address evidence on the record adequately in making its determination. The court concludes that Commerce's decision to classify SeAH's proprietary oil country tubular goods as code 080 is unsupported by substantial evidence on the record and remands the issue for further consideration consistent with this opinion.

**VIII.   Cap on Adjustment for Freight Revenue on SeAH's U.S. Sales**

When calculating SeAH's constructed export price, Commerce offset freight charges and applied a cap on freight revenue for invoices where freight was separately billed. See Final IDM at 97. SeAH contends that Commerce's decision to do so is contrary to law because Commerce does not have the authority to deduct freight costs that are not included in the merchandise cost. See SeAH Br. 5. SeAH contests also Commerce's decision to apply a cap for freight revenues but not for losses in export price. See id. at 5–6.

Under 19 U.S.C. § 1677a(c)(2)(A), "[t]he price used to establish export price and constructed export price shall be . . . reduced by . . . the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." See 19 U.S.C. § 1677a(c)(2)(A).

Export price or constructed export price is the price at which the subject merchandise is first sold in the United States, as opposed to the sale price in the exporter's home country.  See 19 U.S.C. §§ 1677a(a), 1677b(a)(1)(B)(i).

Commerce uses adjustments when calculating export price or constructed export price "to create a fair, 'apples-to-apples' comparison between U.S. price and foreign market value."  Fla. Citrus Mut. v. United States, 550 F.3d 1105, 1110 (Fed. Cir. 2008) (quoting Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).  Such adjustments prevent exporters from improperly inflating the export price of a good by charging a customer for freight more than the exporter's actual freight expenses.  See Dongguan Sunrise Furniture Co. v. United States, 36 CIT __, __, 865 F. Supp. 2d 1216, 1248–49 (2012).  Commerce reasonably adjusts its price calculation using net freight revenue.  See id. at __, 865 F. Supp. 2d at 1248.  It is reasonable for Commerce not to consider freight revenue as part of the price of the subject merchandise in accordance with the statutory language.  See id. at __, 865 F. Supp. 2d at 1248–49.

SeAH contends that Commerce's treatment of freight revenue below the cap as part of the U.S. price in its calculations, and freight revenue above the cap as not part of the U.S. price in its calculations, is inconsistent with the statute.  See SeAH Br. 35; SeAH Reply 15.  SeAH argues that under the language of section 1677a(c)(2)(A), when Commerce deducted the actual freight costs for sales with separately-invoiced freight charges it must have found that those costs were "included in" the "price used to establish export price and constructed export price," otherwise Commerce would not have been permitted to adjust them.  See SeAH Br. 34.  This is an incorrect reading of the statute.  Section 1677a requires Commerce to make adjustments when calculating export price or constructed export price "to create a fair, 'apples-to-apples'

comparison between U.S. price and foreign market value." <u>Fla. Citrus Mut.</u>, 550 F.3d at 1110.

A proper comparison between the U.S. price and foreign market value would not include a profit

earned from freight rather than from the sale of the subject merchandise.  The court concludes

that Commerce's treatment of freight revenue is in accordance with the law.

### IX.     Adjustment for SeAH's Ocean Freight Costs on Third-Country Sales

SeAH's shipments to one Canadian customer were made in containers, while shipments

to other Canadian customers and United States customers were made in bulk.  <u>See</u> Final IDM at

100.  The per-unit international freight rates for the container shipments were higher than the

per-unit rates for bulk shipments.  <u>Id.</u>  Commerce adjusted SeAH's Canadian international

freight expenses "to account for the difference between the reported per-unit rates for

containerized and bulk shipments."  <u>See id.</u> at 60, 78, 100.  SeAH disputes the amount of the

adjustment, arguing that Commerce erred by using the average ocean freight for bulk shipments

from the Canadian sales price for container shipments, as opposed to the actual cost for ocean

freight incurred by SeAH on Canadian sales made using containers.  <u>See</u> SeAH Br. 36–38.

The statute directs Commerce to make adjustments when calculating normal value.

Commerce shall reduce the price by an amount "attributable to any additional costs, charges, and

expenses incident to bringing the foreign like product from the original place of shipment to the

place of delivery to the purchaser."  <u>See</u> 19 U.S.C. § 1677b(a)(6)(B)(ii).  Commerce may adjust

for moving expenses.  <u>See</u> 19 C.F.R. § 351.401(e)(1).

SeAH contends that Commerce did not explain why it was appropriate for Commerce to

place the per-unit rates for Canadian containerized shipments on par with the per-unit rates for

Canadian bulk shipments.  <u>See</u> SeAH Br. 36–37.  In the <u>Final Results,</u> Commerce explained that

it did so to "*account for the difference* between the reported per-unit rates for containerized and

bulk shipments."  Final IDM at 60, 78, 100 (emphasis added).  Commerce must reduce its price

calculation by an amount attributable to any additional costs, charges, and expenses.  Commerce

thus needed to account for the significant price difference between reported freight costs for one

Canadian customer and SeAH's other Canadian customers.  Because Commerce explained that it

made the adjustment to account for the difference between the container and bulk shipments, the

court finds that Commerce's adjustment is supported by substantial evidence.

### X.      Deduction of General and Administrative Expenses as U.S. Selling Expenses

Commerce allocated the general and administrative ("G&A") expenses related to resold

United States products for SeAH's U.S. affiliate Pusan Pipe America Inc. ("PPA").  See id. at 87.

SeAH contends that PPA's administrative activities related to the overall activities of the

company and thus are not all selling expenses that can be deducted.[5]  See SeAH Br. 38–39.

When calculating a constructed value, Commerce must include selling, general, and

administrative expenses.  See 19 U.S.C. § 1677b(e)(B)(i)–(iii).  G&A expenses are generally

understood to mean expenses that relate to the activities of the company as a whole rather than to

---

[5] The Government argues that "SeAH's elaborate multi-page arguments presented to the Court
are different from the scant one-paragraph argument on this issue it presented to the agency," and
that the "sole issue before the agency was whether Commerce's treatment of G&A expenses was
in line with its practice, which Commerce addressed."  Def. Resp. 41.  To the extent SeAH
presents new arguments before the court, the Government contends that the court should
disregard them for SeAH's failure to exhaust its administrative remedies.

 Section 2637(d) provides that the court shall, where appropriate, require the exhaustion of
administrative remedies.  28 U.S.C. § 2637(d).  The exhaustion requirement is discretionary.  See
United States v. Priority Prods., Inc., 793 F.2d 296, 300 (Fed. Cir. 1986).  SeAH exhausted its
administrative remedies through its submission of a case brief in the administrative proceeding.
See Rebuttal Brief of SeAH Steel Corporation at 50–51, PD 526, bar code 3544500-01 (Feb. 16,
2017).

the production process.  Torrington Co. v. United States, 25 CIT 395, 431, 146 F. Supp. 2d 845,

885 (2001).  The court affords Commerce deference in developing a methodology for including

G&A expenses in the constructed value calculation because it is a determination involving

complex economic and accounting decisions of a technical nature.  See Fujitsu Gen. Ltd., 88

F.3d at 1039; see also Mid Continent Steel & Wire, Inc. v. United States, 41 CIT __, __, 273 F.

Supp. 3d 1161, 1166 (2017).  Commerce still must explain cogently why it has exercised its

discretion in a given manner.  See State Farm, 463 U.S. at 48–49.

 Commerce explained that "[b]ecause PPA's G&A activities support the general activities

of the company as a whole, including its sales and further manufacturing functions of all

products," it applied the "G&A ratio to the total cost of further manufactured products . . . as

well as to the cost of all resold products."  Final IDM at 87–88.  This explanation does not clarify

why Commerce deducted PPA's G&A expenses for resold products, nor does it clarify how

Commerce determined that it would apply all of PPA's G&A expenses to resold products.  The

court concludes that Commerce's decision to deduct G&A expenses in the Final Results is

unsupported by substantial evidence on the record and remands on this issue for clarification or

reconsideration of Commerce's methodology.

## XI.     Adjustment to SeAH's Reported Costs for Cost of Production

 SeAH reported varying raw material costs because the price of hot-rolled coil declined

substantially during the period of review.  See SeAH Br. 42–43.  Commerce adjusted SeAH's

reported costs for cost of production by applying facts available and assigning a single weighted-

average cost for hot-rolled coil for each product grade code during the period of review in the

Final Results.  See Final IDM at 102–04.  SeAH argues that the adjustment was improper

because it introduced distortions into Commerce's separate calculation as to whether SeAH's

comparison market sales were made at below-cost prices.  See SeAH Br. 43.

Cost of production is calculated based on the records of the exporter or producer of the

merchandise.  19 U.S.C. § 1677b(f)(1)(A).  The statute requires that the records: (1) must be kept

in accordance with the generally accepted accounting principles of the exporting country, and

(2) reasonably reflect the costs associated with the production and sale of the merchandise.  Id.

In other words, the statute provides that as a general rule, an agency may either accept financial

records kept according to generally accepted accounting principles in the country of exportation

or reject the records if accepting them would distort the company's true costs.  Am. Silicon

Techs. v. United States, 261 F.3d 1371, 1377 (Fed. Cir. 2001) (citing Thai Pineapple Pub. Co.,

Ltd. v. United States, 187 F.3d 1362, 1366 (Fed. Cir. 1999); NTN Bearing Corp. v. United

States, 74 F.3d 1204, 1206 (Fed. Cir. 1995)).  Commerce is directed to consider all available

evidence on the proper allocation of costs.  19 U.S.C. § 1677b(f)(1)(A).

Physical characteristics are a prime consideration when Commerce conducts its analysis.

Thai Plastic Bags Indus. Co., Ltd. v. United States, 746 F.3d 1358, 1368 (Fed. Cir. 2014).  If

factors beyond the physical characteristics influence the costs, however, Commerce will

normally adjust the reported costs in order to reflect the costs that are based only on the physical

characteristics.  See id.  Commerce interprets the proper allocation of adjustment to costs.  Id.

Commerce adjusted SeAH's reported costs because it found that while SeAH's normal

books and records were kept in accordance with Korean generally accepted accounting

principles, the hot-rolled coil costs in SeAH's normal books and records "did not reasonably

reflect the actual production costs of the merchandise because the differences in [hot-rolled coil]

costs between products were unrelated to the product *[sic]* physical characteristics." Final IDM

at 104. Commerce addressed SeAH's concern and stated that the adjustment ensured "that the

product-specific costs . . . used for the sales-below-cost test, [constructed value], and [difference-

in-merchandise] adjustment accurately reflect the precise physical characteristics of the products

whose sales prices are used" in Commerce's dumping calculations. Id. The law permits

Commerce to make adjustments to reported costs of production so that the costs reflect

differences only in the product's physical characteristics. The court concludes that Commerce's

decision to adjust SeAH's reported costs for cost of production is in accordance with the law.

## XII.    Adverse Facts Available

Maverick contests Commerce's decision not to apply total AFA to SeAH with respect to

the following areas: (1) sales of couplings, (2) sales of non-prime products, (3) reported hot-

rolled coil costs, (4) inventory movement schedules, (5) international freight expenses, (6)

transaction-specific reporting for certain movement expenses, (7) payment terms for Canadian

sales, (8) warehousing expenses, (9) warranty expenses, (10) inventory movement schedules for

by-products and scrap, (11) costs to repair damaged products, (12) unconsolidated financial

statements, and (13) inputs from affiliated parties. Commerce declined to apply AFA to the first

twelve areas and applied partial AFA with respect to SeAH's inputs from affiliated parties. See

Final IDM at 49–74.

Section 776 of the Tariff Act provides that if necessary information is not available on

the record or if a respondent fails to provide such information by the deadline for submission of

the information or in the form and manner requested, then the agency shall use the facts

otherwise available in reaching its determination. 19 U.S.C. § 1677e(a)(1), (a)(2)(B). If the

Department finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the agency, then the Department may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.  Id. § 1677e(b)(1)(A).  Commerce may rely on information derived from the petition, a final determination in the investigation, a previous administrative review, or any other information placed on the record when making an adverse inference.  See id. § 1677e(b)(2); 19 C.F.R. § 351.308(c) (2015).  19 U.S.C. § 1677e grants the Department discretion to decide whether to apply AFA in each case.  See 19 U.S.C. § 1677e.  When Commerce can independently fill in gaps in the record, adverse inferences are not appropriate.  See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

Commerce addressed SeAH's cooperation and compliance regarding each of the thirteen areas in its Final Results and provided adequate support for its decision not to apply total AFA to each area.  See Final IDM at 49 (sales of couplings), 51 (sales of non-prime products), 52 (reported hot-rolled coil costs), 54–55 (inputs from affiliated parties), 56 (inventory movement schedules), 58–60 (international freight expenses), 61–63 (transaction-specific reporting for certain movement expenses), 64–65 (payment terms for Canadian sales), 67 (warehousing expenses), 72 (warranty expenses), 72–73 (inventory movement schedules for by-products and scrap), 73 (costs to repair damaged products), 74 (unconsolidated financial statements).  Commerce reasonably decided not to apply total AFA to SeAH based on SeAH's cooperation in each of the thirteen areas.  The court concludes that Commerce's decision not to apply total adverse facts available to SeAH is supported by substantial evidence.

### XIII.   Adjustment to SeAH's Packing Expenses

Commerce declined to make adjustments to SeAH's reported packing expenses in the Final Results.  See id. at 82.  Maverick argues that Commerce erred in not making adjustments for perceived distortions in SeAH's packing expenses.  See Maverick Br. 18–20.  Maverick contends that Commerce's decision is unsupported by substantial evidence on the record because it failed to explain adequately the large differences in SeAH's reported packing expenses and SeAH's different types of packing between SeAH's U.S. and Canadian sales.  See id.

Contrary to Maverick's contentions, Commerce's acceptance of SeAH's packing expenses was not devoid of support entirely.  Commerce did not find that SeAH's packing costs were distorted after an examination of SeAH's Canadian database.  See Final IDM at 82.  SeAH explained, and SeAH's sales database confirmed, that most of SeAH's Canadian sales were threaded and coupled during the period of review, whereas SeAH's U.S. sales were not.  See id. Threaded and coupled oil country tubular goods "required protective caps to avoided damage to the threaded ends."  Id.  "Because plain-end [oil country tubular goods] did not require protective caps, the costs to pack [oil country tubular goods] for export to the United States were, on average, less than the costs to pack [oil country tubular goods] for export to Canada."  Id.  The record shows that Commerce examined SeAH's packing expenses and sales databases and reasonably concluded, based on the record, that an adjustment to SeAH's packing expenses was unnecessary.  The court concludes that Commerce's decision to not make adjustments to SeAH's packing expenses is supported by substantial evidence on the record.

**XIV.   Adjustment to SeAH's Reported Scrap and By-Product Data**

SeAH reported generating three types of by-products: off-grade pipe, defective pipe, and steel scrap.  Commerce accepted SeAH's claimed scrap offset in the Final Results.  See id. at 88–89.

Maverick argues that Commerce erred in not making adjustments for inconsistencies in SeAH's reported scrap and by-product data.[6]  See Maverick Br. 21.  Maverick contests further that SeAH failed to "fully address adjustments" made in the questionnaire responses, "explain differences between scrap types, prepare separate inventory movement schedules for each type of scrap, and fully explain how [it] calculated its scrap offset."  Id.  Maverick contends that Commerce failed to address its concerns, and that Commerce's decision to not make adjustments was unreasonable and is unsupported by substantial evidence on the record.

Maverick raised its concerns in the administrative review.  At Commerce's request, SeAH provided a monthly inventory movement schedule for each type of scrap code for the period of review, as well as an explanation of how generated scrap was valued and how generated scrap and scrap sales were recorded in SeAH's normal books and records.  See Final IDM at 72.  Commerce reviewed the value of each type of scrap offset used in the calculation of certain control numbers.  See Final IDM at 89; see also Memorandum from Ji Young Oh to Neal M. Halper re: Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Results – SeAH Steel Corp., Ltd. at 2, PD 477, bar code 3512499-01 (Oct. 6, 2016).

---

[6] Specifically, Maverick argues that SeAH's cost buildups, as reported in its questionnaire responses, refer to [[                                                      ]].  See Mem. Consolidated Pl. Maverick Tube Corp. Supp. Mot. J. Agency R. 21, Oct. 13, 2017, ECF No. 88 (confidential brief).

Commerce compared the scrap offset values used for those control numbers to the scrap

inventory movement schedule maintained in SeAH's normal books and records during the period

of review.  See Final IDM at 89.  Commerce determined that the reported scrap offset values

were based on the quantity and value of each type of scrap code generated during the period of

review and found SeAH's reported scrap offset calculation methodology to be reasonable.  See

id.  Commerce addressed Maverick's specific concerns in the administrative review.  Maverick's

arguments regarding Commerce's findings on the reported scrap offset issue would require an

impermissible reweighing of the evidence.  See Downhole Pipe & Equip., L.P. v. United States,

776 F.3d 1369, 1376–77 (Fed. Cir. 2015) (citing Trent Tube Div., Crucible Materials Corp. v.

Avesta Sandvik Tube AB, 975 F.2d 807, 815 (Fed. Cir. 1992)).  The court concludes that

Commerce's adjustment to SeAH's reported scrap and by-product data is supported by

substantial evidence.

## CONCLUSION

For the foregoing reasons, the court concludes that:

1.  Commerce's finding of a particular market situation is unsupported by
    substantial evidence;

2.  Commerce's decision to adjust NEXTEEL's input costs based on a separate
    proceeding is remanded for further consideration;

3.  Commerce's dumping margin calculation for non-examined companies is
    remanded for further consideration;

4.  Commerce's calculation of NEXTEEL's constructed value profit is supported
    by substantial evidence and in accordance with the law;

5. Commerce's finding that NEXTEEL is affiliated with POSCO and POSCO Daewoo is supported by substantial evidence;

6. Commerce's use of its differential pricing analysis is supported by substantial evidence and in accordance with the law;

7. Commerce's classification of proprietary SeAH products is unsupported by substantial evidence;

8. Commerce's decision to cap the adjustment for freight revenue on SeAH's U.S. sales is in accordance with the law;

9. Commerce's decision to not make an adjustment for SeAH's ocean freight costs incurred on third-country sales is supported by substantial evidence;

10. Commerce's decision to deduct SeAH's general and administrative expenses as U.S. selling expenses is unsupported by substantial evidence;

11. Commerce's decision to adjust SeAH's reported costs when calculating cost of production is in accordance with the law;

12. Commerce's decision to not apply total AFA to SeAH is supported by substantial evidence;

13. Commerce's decision to not adjust SeAH's packing expenses is supported by substantial evidence; and

14. Commerce's adjustment to SeAH's reported scrap and by-product data is supported by substantial evidence.

Accordingly, it is hereby

**ORDERED** that the Rule 56.2 motions for judgment on the agency record filed by NEXTEEL, Husteel, Hyundai, SeAH, AJU Besteel, and ILJIN are granted in part; and it is further

**ORDERED** that the Rule 56.2 motion for judgment on the agency record filed by Maverick is denied; and it is further

**ORDERED** that the <u>Final Results</u> are remanded to Commerce for further proceedings consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination on or before April 2, 2019; and it is further

**ORDERED** that Commerce shall file the administrative record on remand on or before April 16, 2019; and it is further

**ORDERED** that the Parties shall file comments on the remand redetermination on or before May 2, 2019; and it is further

**ORDERED** that the Parties shall file replies to the comments on or before June 3, 2019; and it is further

**ORDERED** that the joint appendix shall be filed on or before June 17, 2019.


  /s/ Jennifer Choe-Groves  
Jennifer Choe-Groves, Judge

Dated:    January 2, 2019  
         New York, New York