Slip Op. 19-116

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NEXTEEL CO., LTD., <br><br> Plaintiff, <br><br> HYUNDAI STEEL COMPANY, HUSTEEL CO., LTD., AJU BESTEEL CO., LTD., MAVERICK TUBE CORPORATION, and SEAH STEEL CORPORATION, <br><br> Consolidated Plaintiffs, <br><br> and <br><br> HUSTEEL CO., LTD., HYUNDAI STEEL COMPANY, and ILJIN STEEL CORPORATION, <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> TMK IPSCO, VALLOUREC STAR, L.P., WELDED TUBE USA INC., MAVERICK TUBE CORPORATION, and UNITED STATES STEEL CORPORATION, <br><br> Defendant-Intervenors. | Before: Jennifer Choe-Groves, Judge <br><br> Consol. Court No. 17-00091 |

**OPINION AND ORDER**

[Sustaining in part and remanding in part the U.S. Department of Commerce's remand redetermination following an administrative review of the antidumping order on oil country tubular goods from the Republic of Korea.]

                                                                                    Dated: September 4, 2019

J. David Park, Michael T. Shor, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, and Kang W. Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Plaintiff NEXTEEL Co., Ltd. and Consolidated Plaintiff Hyundai Steel Company.

Donald B. Cameron, Eugene Degnan, Brady W. Mills, Julie C. Mendoza, Mary S. Hodgins, and Rudi W. Planert, Morris, Manning & Martin, LLP, of Washington, D.C., for Consolidated Plaintiff Husteel Co., Ltd.

Jarrod M. Goldfeder and Robert G. Gosselink, Trade Pacific, PLLC, of Washington, D.C., for Consolidated Plaintiff AJU Besteel Co., Ltd.

Gregory J. Spak, Frank J. Schweitzer, and Kristina Zissis, White & Case, LLP, of Washington, D.C., for Consolidated Plaintiff and Defendant-Intervenor Maverick Tube Corporation.

Jeffrey M. Winton and Amrietha Nellan, Law Office of Jeffrey M. Winton PLLC, of Washington, D.C., for Consolidated Plaintiff SeAH Steel Corporation. Jordan Fleischer also appeared.

Roger B. Schagrin, Elizabeth J. Drake, and Christopher T. Cloutier, Schagrin Associates, of Washington, D.C., for Defendant-Intervenors TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc. Paul W. Jameson also appeared.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

Hardeep K. Josan, Attorney, U.S. Department of Justice, of New York, N.Y., for Defendant United States. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Mykhaylo A. Gryzlov, Senior Counsel, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance, of Washington, D.C.

Joel D. Kaufman and Richard O. Cunningham, Steptoe & Johnson LLP, of Washington, D.C., for Plaintiff-Intervenor ILJIN Steel Corporation.

Choe-Groves, Judge: This action arises from the U.S. Department of Commerce's ("Commerce") administrative review of the antidumping order on oil country tubular goods ("OCTG") from Korea. See Certain Oil Country Tubular Goods from the Republic of Korea, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty administrative review; 2014–2015), as amended, 82 Fed. Reg. 31,750 (Dep't Commerce July 10,

2017) (amended final results of antidumping duty administrative review; 2014–2015) ("Final Results").  Before the court are the Final Results of Redetermination Pursuant to Court Remand, Apr. 2, 2019, ECF No. 169 ("Remand Redetermination"), pursuant to the court's decision in NEXTEEL Co., Ltd. v. United States, 43 CIT __, __, 355 F. Supp. 3d 1336, 1343 (2019) ("NEXTEEL I").  For the following reasons, the court sustains in part and remands in part the Remand Redetermination.

## PROCEDURAL HISTORY

The court presumes familiarity with the facts of this case.  See NEXTEEL I, 355 F. Supp. 3d at 1344–52, 1357–58, 1360–61.  In NEXTEEL I, the court considered seven Rule 56.2 motions for judgment on the agency record and fourteen issues presented by the Parties.  See id. at __, 355 F. Supp. 3d at 1343–44.  The court sustained in part and remanded in part Commerce's Final Results.  Id. at 1344, 1364.  Consolidated Plaintiff SeAH Steel Corporation ("SeAH") and Defendant-Intervenors Maverick Tube Corporation, TMK IPSCO, Vallourec Star, L.P., Welded Tube USA, and United States Steel Corporation filed motions for reconsideration of the court's decision in NEXTEEL I as to SeAH's ocean freight expenses, Commerce's application of differential pricing analysis, and the particular market situation adjustment.  See, 43 CIT __, __, __ F. Supp. 3d __, __, Consol. Court No. 17-00091, 2019 WL 2218739, at *1 (CIT May 21, 2019) ("NEXTEEL II").  The court denied both motions for reconsideration.  Id. at *4.

Commerce filed its Remand Redetermination on April 2, 2019.  See Remand Redetermination.  Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL") and Plaintiff Intervenor Hyundai Steel Company ("Hyundai Steel") filed comments.  Comments of NEXTEEL and Hyundai Steel in Support of the U.S. Dep't of Commerce's Final Results of Redetermination Pursuant to Ct.

Remand, May 2, 2019, ECF No. 174 ("NEXTEEL and Hyundai Steel Br."). Consolidated Plaintiff AJU Besteel Co., Ltd. ("AJU Besteel") filed comments. Comments of Consolidated Pl., AJU Besteel Co., Ltd., on Commerce's Remand Redetermination May 2, 2019, ECF No. 175 ("AJU Besteel's Br."). Plaintiff-Intervenor Husteel Co., Ltd. ("Husteel") filed comments. Husteel's Comments on Redetermination Pursuant to Ct. Remand Order, May 2, 2019, ECF No. 171 ("Husteel Br."). SeAH filed comments. Comments of SeAH Steel Corp. on Commerce's April 2, 2019, Redetermination, May 2, 2019, ECF No. 173 ("SeAH Br.").[1] Defendant-Intervenors TMK Ipsco, Vallourec Star, L.P., Welded Tube USA Inc., Maverick, and United States Steel Corporation filed comments. Def.-Intervenors' Comments on Commerce's Remand Results, May 2, 2019, ECF No. 172 ("Def.-Intervenors' Br.").

Defendant United States replied. Def.'s Resp. to Comments Regarding the Remand Redetermination, Jun. 3, 2019, ECF No. 178 (Def.'s Reply Br."). Maverick replied. Reply of Def.-Intervenor Maverick Tube Corp. to Comments of SeAH Steel on Commerce's Final Results of Redetermination Pursuant to Ct. Remand, Jun. 3, 2019, ECF No. 179 ("Maverick's Reply Br."). NEXTEEL and Hyundai Steel replied. Reply of NEXTEEL and Hyundai Steel to Def.-Intervenors' Comments on the U.S. Dep't of Commerce's Final Results of Redetermination Pursuant to Ct. Remand, Jun. 3, 2019, ECF No. 180 ("NEXTEEL's and Hyundai's Reply Br.").

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) (2012) and 28 U.S.C. § 1581(c), which grant the court the authority to review actions contesting the final results of an

---

[1] SeAH submitted comments requesting that the court remand the dumping margin recalculation issue as to SeAH's ocean freight costs. The court considers the issue moot following the court's ruling in NEXTEEL II. See 43 CIT __, __, __ F. Supp. 3d __, __, Consol. Court No. 17-00091, 2019 WL 2218739, *1.

administrative review of an antidumping duty order. The court will uphold Commerce's determinations, findings, or conclusions unless they are unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## ANALYSIS

### I.     Particular Market Situation

During the initial administrative proceedings, Commerce did not find the existence of a particular market situation in its preliminary results, but later relied on the same administrative record to reverse its position and conclude that a particular market situation existed in the final results. See NEXTEEL I, 43 CIT at __, 355 F. Supp. 3d at 1345–46. The court concluded that Commerce's determination was unsupported by substantial evidence and instructed Commerce on remand to remove its finding of a particular market situation from its antidumping duty calculations. See id. at __, 355 F. Supp. 3d at 1349–51.

On remand, Commerce recalculated the dumping margin for SeAH, NEXTEEL, and the non-examined companies under protest. Remand Redetermination 5–6, 23. Commerce did not apply the particular market situation adjustment in the recalculated margins. Id.[2]

Defendant-Intervenors argue that the Remand Redetermination is unsupported by substantial evidence and that a second remand is warranted. Def.-Intervenors' Br. 1–2. Defendant counters that Commerce complied with the court's instructions, Commerce could not have reached a different result on the basis of a party's comments, and Defendant-Intervenors

---

[2] In NEXTEEL I, the court did not reach the issue of Commerce's adjustment of NEXTEEL's input costs based on a separate administrative proceeding that resulted from Commerce's finding of a particular market situation. See NEXTEEL I, 43 CIT __, __, 355 F. Supp. 3d at 1351. Because Commerce removed the particular market situation adjustment on remand, Commerce recalculated NEXTEEL's margins, and NEXTEEL requests that the court sustain the Remand Redetermination as to particular market situation, the court considers this issue moot. See Remand Redetermination 6; NEXTEEL and Hyundai Steel Br. 7.

already sought reconsideration of the particular market situation issue.  Def.'s Reply Br. 5–7; see also NEXTEEL II, 43 CIT at __, __ F. Supp. 3d at ___, 2019 WL 2218739, at *1.  Husteel and AJU Besteel agree that Commerce's Remand Redetermination complies with the court's remand instructions and request that the court affirm the Remand Redetermination as to the particular market situation issue.  Husteel Br. 2; AJU Besteel Br. 1–2.

Defendant-Intervenors' arguments are unpersuasive.  First, Defendant-Intervenors argue that Commerce's removal of a particular market situation adjustment is unsupported by substantial evidence.  Def.-Intervenors' Br. 6–7.  To the contrary, in the underlying administrative proceeding, Commerce found that the record did not support any of Maverick's four allegations of a particular market situation in Korea.  See NEXTEEL I, 43 CIT at __, 355 F. Supp. 3d at 1349–51 (citing Department's Memorandum Pertaining to Maverick's Particular Market Situation Allegations, PD 531, bar code 3545522-01 (Feb. 22, 2017)).  Defendant-Intervenors fail to point to any evidence to support Defendant-Intervenors' contention that Commerce's decision on remand to remove the particular market situation adjustment is unsupported by substantial evidence.  See Def.-Intervenors' Br. 1–2.

Second, Defendant-Intervenors' arguments regarding the court's instructions to Commerce as to particular market situation were briefed when Defendant-Intervenors sought reconsideration of the court's opinion.  See NEXTEEL II, 43 CIT at __, __ F. Supp. 3d at __, 2019 WL 2218739, at *3–4, *8–10.  Defendant-Intervenors do not identify any arguments that would be raised in comments to Commerce that Defendant-Intervenors did not raise in their motion for reconsideration or other briefing before Commerce or this court.  See Def.-Intervenors' Br. 5–6.

Because Commerce recalculated the dumping margin for SeAH, NEXTEEL, and the non-examined companies without applying the particular market situation adjustment in the recalculated margins, the court concludes that Commerce's Remand Redetermination is consistent with the court's remand order and opinion in NEXTEEL I as to the issue of particular market situation. See NEXTEEL I, 43 CIT at __, 355 F. Supp. 3d at 1364.

II.     **Classification of Proprietary SeAH Products**

In NEXTEEL I, the court addressed Commerce's decision to combine SeAH's proprietary OCTG under reporting code 075 with reporting code 080. See 43 CIT at __, 355 F. Supp. 3d at 1357–58. During the investigation, Commerce's initial questionnaire asked SeAH to report a separate reporting code for proprietary grades of OCTGs that were not listed in the American Petroleum Institute ("API") Specification for Casing and Tubing ("API Specification 5CT"). See Remand Redetermination 6; see also Initial Questionnaire, PR 100, bar code 3441771-01 (Feb. 12, 2016) ("Initial Questionnaire"). SeAH informed Commerce that SeAH sold three proprietary grades of OCTG in the United States during the period of review that had "the same tensile strength required by the N-80 specification but is not heat treated (by normalization or by quenching-and-tempering) in the manner required by the N-80 norms." SeAH's Initial Section B–E Response at 8 n.4, PD 140, bar code 3454399-02 (Mar. 31, 2016) ("SeAH's Initial Section B–E Response"). In the Final Results, Commerce combined SeAH's reported code 075 with code 080. See Issues and Decision Memorandum for the Final Results of the 2014-2015 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea, 95–97, A-580-870, ECF No. 58–2 (Apr. 17, 2017) ("Final IDM"). Commerce found that because SeAH's proprietary OCTG products shared the same mechanical properties as OCTG under reporting code 080 (i.e., tensile and hardness

requirements), the goods should be grouped together and that "[a]ny differences between these grades were already captured in other product characteristics." Id. at 96.

The court determined in NEXTEEL I that Commerce did not distinguish meaningfully between a product's physical characteristics and production process in the Final Results and that Commerce did not address evidence on the record adequately in making its determination. NEXTEEL I, 43 CIT at __, 355 F. Supp. 3d at 1358. The court concluded that Commerce's classification of SeAH's proprietary OCTG products was unsupported by substantial evidence. Id.

On remand, Commerce explained that the model match methodology used to determine dumping margins in this action contained a hierarchy of criteria designed to reflect differences between products, and that Commerce ranked those differences in order of importance. See Def.'s Reply Br. 7–8. The more important matching characteristics were listed higher than the less important criteria in the hierarchy. Remand Redetermination 7. Commerce ranked physical characteristics (such as grade) above production processes (such as heat treatment). Id. at 7–8. In the hierarchy, grade was the third-highest product characteristic, and heat treatment was the ninth-highest. Id.; see also Initial Questionnaire B-6–B-12. Commerce noted that the absence of the heat treatment process was the distinguishing characteristic between API Specification 5CT grade code N-80 products and SeAH's proprietary products. Remand Redetermination 7. Under the model match hierarchy, the distinguishing characteristic of heat treatment was captured by the ninth-highest criteria. Id. Commerce assessed that the distinction between the physical characteristics and production process stemmed from the effect of those criteria on the products' performance capabilities. Id. at 7–10; see also id. at 8 (identifying that "[b]ecause OCTG are used in the well and, thus, must withstand significant internal and external pressures at various

depths, the key physical properties, such as tensile strength and hardness, are essential to determining the capabilities of a particular OCTG product") (internal quotation omitted). Commerce concluded that it was not logical to create a grade distinction at the third-level of the model match hierarchy for heat treatment because heat treatment was captured by the ninth-highest level. Id.

Addressing the record on remand, Commerce identified that SeAH's proprietary products "offered higher strength levels than [API Specification 5CT grade code] J-55 or K-55, equivalent with N-80 grade products" and had "the same mechanical properties (i.e., tensile strength and hardness) required by the N-80 specification, which [had] the assigned code 080." Id. at 7–10 (citing Administrative Review of the Antidumping Order on Oil Country Tubular Goods from Korea – Case Brief of SeAH Steel Corporation, 10–11, bar code 3541806-01 (Feb. 9, 2017)) (internal quotations omitted); see also Administrative Review of the Antidumping Order on Oil Country Tubular Goods from Korea – Case Brief of SeAH Steel Corporation, 11, bar code 3541806-01 (Feb. 9, 2017); SeAH's Initial Section B–E Response 8, 55–56. Commerce noted that "SeAH stated that it developed its proprietary grades specifically to compete with N-80 grade products and upgradeable L-80 products in the North American market, but without going through the heat treatment process." Remand Redetermination 8; see also SeAH Steel's Response to July 1 Supplemental Questionnaire, P.D. 253 (Jul. 29, 2016) at 11 n.6.

SeAH argues that Commerce's Remand Redetermination does not correctly classify SeAH's proprietary products as API Specification 5CT grade code N-80 based on the mechanical properties of the pipe. SeAH Br. 2–5. SeAH contends that under the API grading criteria, it would be possible for a particular pipe to be categorized under multiple grade codes based on mechanical properties such as yield strength and tensile strength, if heat treatment is not

considered. Id. at 4–5. SeAH also asserts that the stencil on the OCTG product, which identifies the grade of the pipe, constitutes a physical characteristic of the pipe. SeAH Br. 5–6.

Defendant counters that the model match hierarchy employed in this case was adopted to compare products with similar characteristics for the purpose of determining the dumping margin. See Def.'s Reply Br. 7–8, 10; Remand Redetermination 6–9. Defendant contends that the model match hierarchy does not equate tensile strength with grade, and that the API standards are designed to establish specifications for certain products, not compare products with similar physical characteristics. See Def.'s Reply Br. 11–12. Defendant also counters that stenciling is not a physical characteristic because if the stencil is required, then SeAH would not create non-API grade proprietary products to compete with API grade code N-80 products.

The court is not persuaded by SeAH's arguments. First, while API Specification 5CT may be informative, it is not controlling as to the methodology employed by Commerce. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1044 (1996).[3] Second, Defendant's model match hierarchy did not classify SeAH's products within the precise meaning of the API Specification 5CT. Commerce's questionnaire asked SeAH to report OCTG product grades and provided a reference chart to allow conversion between API Specification 5CT grade code N-80 and Commerce's reporting code 080. Initial Questionnaire 9. For proprietary products not fitting within the API Specification 5CT, the Initial Questionnaire directed the creation of a separate reporting code along with technical documentation describing how the additional grades compared to Commerce's reporting codes and API Specification 5CT. Id.

---

[3] See also SeAH's Section A Questionnaire Resp., API Specification 5CT, App'x A–10, PR 130 (Mar. 18, 2016) ("API publications necessarily address problems of a general nature. . . . API publications are published to facilitate the broad availability of proven, sound engineering and operating practices. . . . Users of this specification should not rely exclusively on the information contained in this document.").

Because Commerce's additional explanation of the record supports Commerce's decision to combine SeAH's proprietary OCTG under reporting code 075 with 080, the court concludes that Commerce's model match hierarchy distinguishes between a product's physical characteristics and production process and that Commerce's Remand Redetermination is supported by substantial evidence.  See NEXTEEL I, 43 CIT at __, 355 F. Supp. 3d at 1357–58; Fujitsu Gen., 88 F.3d at 1044.  The court affirms Commerce's Remand Redetermination as to Commerce's classification of SeAH's proprietary products.

**III.   Deduction of General and Administrative Expenses as U.S. Selling Expenses**

In the Final Results, Commerce deducted general and administrative ("G&A") expenses from constructed export price ("CEP") related to resold United States products for SeAH's U.S. affiliate Pusan Pipe America Inc. ("PPA").  See Remand Redetermination at 11–12; Final IDM at 6, 87–88.  Commerce explained that "[b]ecause PPA's G&A activities support the general activities of the company as a whole, including its sales and further manufacturing functions of all products," Commerce applied the "G&A ratio to the total cost of further manufactured products . . . as well as to the cost of all resold products."  Final IDM at 87–88.  The court noted that Commerce's explanation did not clarify why it deducted PPA's G&A expenses for resold products and did not clarify how Commerce determined that it would apply all of PPA's G&A expenses to resold products.  NEXTEEL I, 355 F. Supp. 3d. at 1360–61.  The court concluded in NEXTEEL I that Commerce's decision to deduct G&A expenses in the Final Results was unsupported by substantial evidence on the record and remanded this issue for clarification or reconsideration of Commerce's methodology.  Id. at 1361.

On remand, Commerce explained that "Commerce did not apply 'all' of PPA G&A expenses to directly resold products" and "Commerce allocated PPA G&A expenses

proportionally to all of the products PPA sold (i.e., products which PPA directly resold and products PPA further processed and then resold)." Remand Redetermination at 11–12.  For further manufactured products, Commerce "applied PPA's G&A expense ratio to the total cost of further manufacturing, plus the cost of production . . . of imported OCTG pipe that was further manufactured, and [Commerce] included the amount as further manufacturing under 19 U.S.C. § 1677a(d)(2)." Id. at 14.  Commerce also "applied PPA's G&A expense ratio to the [cost of production] of the imported OCTG for products not further manufactured and included the amount as indirect selling expenses under 19 U.S.C. § 1677a(d)(1)(D)." Id.

An antidumping duty represents the amount by which the normal value of the merchandise exceeds its export price or CEP.  19 U.S.C. § 1673.  CEP is the price at which the subject merchandise is first sold in the United States by a seller affiliated with the producer or exporter to a non-affiliated purchaser.  19 U.S.C. § 1677a(b).  When calculating CEP, Commerce must make adjustments for certain expenses.  Id.; 19 U.S.C. § 1677a(d).  Under 19 U.S.C. § 1677a(d)(2), Commerce is directed to reduce CEP by "the cost of any further manufacture or assembly (including additional material and labor). . . ."  19 U.S.C. § 1677a(d)(2).  Commerce also must reduce the constructed export price by:

> (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—
>
>   (A) commissions for selling the subject merchandise in the United States;
>
>   (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
>
>   (C) any selling expenses that the seller pays on behalf of the purchaser; and
>
>   (D) any selling expenses not deducted under subparagraph (A), (B), or (C).

19 U.S.C. § 1677a(d)(1)(A)–(D).

  SeAH argues that Commerce's methodology is inconsistent with 19 U.S.C. § 1677a(d), that Commerce may not reclassify G&A expenses as selling expenses, that Commerce does not explain why G&A expenses may be reclassified as indirect selling expenses, and that Commerce's treatment of G&A expenses as indirect selling expenses is not consistent with Commerce's treatment of home-market G&A expenses. SeAH Br. at 9–12.

  Commerce counters that G&A expenses can be treated as indirect selling expenses when reselling activity occurs, and all G&A expenses can be treated as further manufacturing expenses when further manufacturing activity occurs. Remand Redetermination at 22; Def.'s Reply Br. 14. Commerce supports its application of G&A expenses as selling expenses in this case because "PPA, SeAH's affiliated reseller in the United States, employs individuals responsible for overseeing, coordinating, and supporting sales of both further manufactured and non-further manufactured products." Def.'s Reply Br. 14. Commerce does not provide support for this proposition. Id.; see also SeAH Br. at 9–12. Based on that proposition, Commerce concludes that "PPA's G&A activities support the general activities of the company, encompassing the sale and further manufacture of products, and the sale of non-further manufactured products." Remand Redetermination at 14. Commerce's explanation on remand does not identify what record evidence supports treatment of G&A expenses as selling expenses. Commerce also responds that treatment of G&A expenses as indirect selling expenses was consistent with its treatment of home-market G&A expenses because Commerce did not calculate a CEP offset in this case. Def.'s Reply Br. at 16.

  Commerce's explanation on remand does not explain adequately what evidence specifically supports the treatment of G&A expenses as selling expenses or why Commerce may

treat G&A expenses as selling expenses.  See also Final IDM 87–88; Issues and Decision Memorandum for Certain Oil Country Tubular Goods from the Republic of Korea, 12, A-580-870 (Oct. 5, 2016) (preliminary results), available at https://enforcement.trade.gov/frn/summary/korea-south/2016-24800-1.pdf (last visited September 4, 2019).  The court concludes that Commerce's Remand Redetermination as to the deduction of G&A as selling expenses is not supported by substantial evidence on the record.  The court remands this issue for Commerce to provide additional clarification of Commerce's calculation of CEP as to PPA, further explanation of why Commerce may treat G&A expenses as selling expenses as to PPA, and record evidence support for the treatment of PPA's G&A expenses as selling expenses.

## CONCLUSION

For the foregoing reasons, the court concludes that:

1. Commerce's finding of a particular market situation and dumping margin calculation for non-examined companies is supported by substantial evidence;

2. Commerce's classification of proprietary SeAH products is supported by substantial evidence;

3. Commerce's decision to deduct SeAH's general and administrative expenses as selling expenses is unsupported by substantial evidence.

Upon consideration of all papers and proceedings in this action, it is hereby

**ORDERED** that Commerce shall file its remand determination on or before November 4, 2019; and it is further

**ORDERED** that Commerce shall file the administrative record on or before November 18, 2019; and it is further

  **ORDERED** that Parties' comments in opposition to the remand determination shall be filed on or before December 4, 2019; and it is further

  **ORDERED** that Parties' comments in support of the remand determination shall be filed on or before January 3, 2020; and it is further

  **ORDERED** that the Joint Appendix shall be filed on or before January 10, 2020.

                    /s/ Jennifer Choe-Groves
                    Jennifer Choe-Groves, Judge

Dated:  September 4, 2019
     New York, New York